Good afternoon, Your Honors. Keith Letourneau for Appellant John Bludworth, Shipyard. May it please the Court, I'd like to address some of the language from the motions panel's decision granting John Bludworth, Shipyard's motion to stay the enforcement of the vacatur of the vessel arrest in the District Court. I'd also like to address the functionality of CIT 103 barge as well as the other two barges, whether interlocutory jurisdiction exists, the credit of the vessel as well as judicial sale. And the vessel or vessels are still connected and under arrest pursuant to the stay, is that correct? That's correct, Your Honor. Okay. So, Your Honor, the motions panel had some very interesting language. They wrote, amongst other things, first though, we are not extending maritime liens to a new situation. We view this case as a relatively straightforward application of the jack-o-lantern. Jack-o-lantern, you may recall, was a Supreme Court case which basically found maritime jurisdiction existed for repairs that converted a railway barge into a floating, for lack of a better term, amusement vessel. Secondly, the motions panel wrote, we do not see our opinion as extending maritime liens into uncharted waters far from it. Failing to recognize a maritime lien here would mark an unjustified retreat from the circumstances in which one would be expected to arise. There are some slight differences from the norm, but the similarities far exceed them. And thirdly, the motions panel, talking about the jack-o-lantern case again, said, even if the Supreme Court did not so hold, we conclude that converting the railroad barge into an amusement steamer created a maritime lien. So those are all very, I would say, positive conclusions that the motions panel reached about why there should be a maritime lien in this case with respect to CIT-103. The dissent- There are also very non-binding findings for this panel. Yes, there are, Your Honor, and that's why I want to elaborate in terms of the repairs that were actually performed to demonstrate that they constitute necessaries. And that was one of the points that Judge Willett made in the dissent in that case, where he was, one of the questions that he had essentially was, and of course we can still ask whether JBS's work was in service of the CIT-103 itself. And if you look at our brief on page 10 of our reply brief, we address some of the issues in terms of what was actually converted. A booster pump was installed along with several other pieces of equipment, including an engine, a skid, a hydraulic power unit, fuel tanks, and a generator. Effectively, the CIT-103 was converted into a booster barge, and that booster barge performed its function quite well, according to T.W. LeQuay, who was the owner pro hoc vice, the bareboat charter of that vessel, when that vessel was taken down to Brownsville to engage in dredging operations. So, in effect, it performed, it created a booster barge, JBS created a booster barge through the work that it generated, and that functionality enabled it to carry out that work. Similarly, if we look at the other two barges in this case, the Isler barge, and I would point out on July 14, 2023, the district court entered default with respect to the Isler barge. We had filed an arrest action against that vessel. There was no response to it, and it was abandoned essentially by the owner, and the owner in that case was the same, Mr. T.W. LeQuay. Because it was effectively defaulted, there is no liability issue, and in effect, the maritime lien exists against that vessel. But that, with respect to the work that was done concerning the Isler barge, it was fitted and welded with anodes to the Isler barge's underwater hull, if you look at page 11 of our reply brief. Seachess valves and strainers were repaired or fabricated and installed as necessary. A lower course handrail was installed. The Isler spud ram was disconnected, re-cabled, re-hosed, and reinstalled on its foundation. All of that work enabled the Isler barge to perform its function essentially as a spud barge where it had a spike, for lack of a better term, that enabled it to pivot and allow the dredge to remain stationary. And then we go back to the Beckholt. The Beckholt was a dredge barge to begin with, Captain Frank Beckholt. It was abrased, blasted, and coated. Its ladder was modified. Sponsons were added. The dredge pump was removed so it could be modified and then replaced. Pontoons were extended, new swing winches and related hydraulic piping was added, and the bulkhead was repaired. In effect, it was improved to allow it to facilitate its function as a dredging barge. All of that is to say, according to T.W. LeQuay, that the conjoined three barges as a dredging unit carried out their function exactly as he had intended. What does his subjective intent have to do with anything? Well, Your Honor, I would say that it has to do with how the barges were going to be employed. But that's not what the test is, is it? Well, Your Honor, the test is whether or not it serves the function of the vessel. And the function of the vessel is the function as dictated by the owner, by the owner pro hoc vice. That is the person who has control of it. And Caillou Islands Council in the bankruptcy proceeding admitted that very thing. Caillou Islands Council admitted at ROA 673, quote, LeQuay has enjoyed full license to deploy the Caillou barge in whatever lawful activities it deemed appropriate. Caillou had no authority to dictate the manner in which LeQuay used the barge, unquote. Okay. Can you help with the district court's analysis? Because the district court made some findings. This is a unique posture that there are actual findings made by the district court. Don't we have to respect those findings that the particular function was to operate as a flat, unpowered deck barge that loaded and transported equipment using a tugboat as a motive power, is that not the function that the vessel was designed for, is what I just said that the district court determined was the function? Well, Your Honor, that is the original design for that deck barge, but that is not consistent with the Jack O'Lantern case. But isn't that what the district court found as a factual matter? And so in order to do something different, we would have to overturn the factual determinations of the district court, not just the legal determination. Well, Your Honor, I would say that it's a combined question of law and fact, but it is predominantly a question of law. And the reason I say that is because if you took that proposition to its logical conclusion, that that essentially means that any vessel cannot be modified and give rise to a maritime lien. That does not make any sense. And the motions panel, again, not binding on this court, certainly reached that same conclusion, is that, in essence, CIT 103 did have a maritime lien. We did have a maritime lien on that vessel because of the work that was performed, because the functionality was the functionality, as could only be determined by the person who was in charge of it. That person was T.W. LeQuay. But that functionality is for the benefit of other vessels, isn't it? Because that is to support the dredging function, which is the overall goal to be a dredging unit, which is not the function of the CIT vessel. Respectfully, Your Honor, I disagree with that. Why? Well, because the district court found that the booster barge was converted, I mean the CIT 103 was converted into a booster barge. Its function at that point in time was to engage as a booster barge to enhance the pumping capacity of the dredge. It was independent. And I go back to Gaspar Deanna. He was the president of JBS when he was asked the question during deposition. The question, would you agree with me that you were basically hired to improve the beckled and you use the CIT as parts for that? Answer, no, because some of the equipment that is on the CIT 103 is independent of the dredge. And that's testimony in the record. It's independent of the dredge because it has a different function. It serves independently as a booster barge. Mr. Leutert, let me ask you, let's say you're right that the district court committed legal error in looking at what the original purpose of that barge CIT 103 was as opposed to the improved purpose a la Jack O'Lantern. Let's say you're right on that. It is still, do we need to find in this unusual circumstance of these three vessels joined together, that the CIT 103 would be able to serve some purpose by itself as opposed to as was being sought by Kalu to take its part back and separate all three of these? I mean, this is an unusual case with this jointer. How does the jointer change our analysis, if at all, and what is the relevance of whether CIT 103 can operate by itself in its new function? Well, Your Honor, I don't think that the jointer alters the analysis because each of those barges had an independent function, and that the CIT 103 theoretically- It serves the other two barges, at least serves the overall unit. And what I'm asking is, do we need a function by the CIT 103 that can be independent of the other two barges? And it can be independent. I was just going to say that, theoretically, that barge, if tasked by its owner or bare-boat charter, could serve as a booster barge in service of another dredging unit. It doesn't have to necessarily be with respect to this one. Does it have to be, insofar as the evidence in this case is, does it have to be joined in the same way, physically combined again to some other vessel or barge? Well, Your Honor, for it to remain as a three-barge conjoined unit, it has to remain connected. To carry out that function, it doesn't have to be disconnected, but it could be disconnected. So, again, it acts as an independent booster barge, and it has a separate pumping capacity. And that is the- that goes back to the point that I was trying to make earlier, and that is that the owner, T.W. LeQuay, was the owner of the either barge, and the owner, Prohoc Viche, he was the bare-boat charterer of both the Captain Frank Bechtholt and the CIT-103. It is his decision, that company's decision, as to what to do with that barge while it's in his possession. Now, he may have an obligation to return the CIT-103 as a flat-powered dredge at the end of the charter. I'm not disputing that. But while it's in his custody and control, and he has unfettered control over it, as Cayo Islands Council has already conceded, then it's up to him to decide what to do with it. But the functionality is the functionality that he has put to it. And that booster barge and Captain Frank Bechtholt and the either barge, they were all capable of carrying out the work, as Mr. LeQuay commented to, after they actually engaged in that work. Can you talk about Martin and Central Boat, please? So Martin and Central Boat, Your Honor, they really are not on point. Martin involved the- Well, the district court thought they were. Well, respectfully, Your Honor, I think the district court erred. And the reason I say that is because Martin was a case where service vessels were used to carry fuel to other vessels for transfer, for their use. It was carried as cargo. It was not equipment. The same is true with respect to the Noor-Goliath case, where Noor-Goliath, its purpose was essentially to load cargo on barges. A towing company asserted a claim against Noor-Goliath when its contractor went belly up, claiming that it would provide towing services to these barges. But the court found that the functionality of the Noor-Goliath was basically just to load and unload cargo onto the barges. In other words, the towing activities of the barges had nothing to do with the activity of the Noor-Goliath. And the difference here, and primarily I think with respect to central-I mean the bourbon-petrol case. The bourbon-petrol case essentially allowed the-did not allow cargo to be treated as a maritime lien. It wouldn't give rise to a maritime lien. That is not what we have here. On the CIT-103, the cargo is-cargo lies fallow when it's aboard a vessel, when it's in transit from one point to the next. Aboard CIT-103, the equipment is in use when it's engaged in dredging activities. It's pumping. It's increasing the pumping capacity of the dredging unit, allowing more dredge spoil to be pulled. I have two more questions. I am out of time, Your Honor. I know, but I have two more questions, please.  Chavez v. M.V. Medina Starr, would that tell us that we would look at-we'd be deciding this on abuse of discretion? Your Honor, I would say that, again, because this is a mixed question of law and fact, I think it's a de novo review because it's primarily an issue of law. What case do you have that says that the review is de novo as opposed to abuse of discretion or even some combination of mixed question of law and fact? Your Honor, I don't have one as I stand here. What standard-the standard of review really matters, don't you think? Yes, Your Honor, it does matter. But in our view, I think we briefed the standard of review in our-but I just-I don't have a case as I stand here. What is the best case for the proposition that worked on a vessel to combine it with two other vessels into a single unit would constitute necessaries? Your Honor, I think the best case and the case that we've been relying upon has to be the jack-o'-lantern because the jack-o'-lantern- That didn't combine it with two other-that's not at all- Well, this is a case in first impression in that respect, but in terms of- Is that right? We did not find any, Your Honor. Okay. Thank you. Thank you. And you've saved time for rebuttal, Mr. Letourneau. Mr. Davis. Your Honors, may it please the Court, Alan Davis on behalf of Cayu Island Towing. I'd like to start by addressing the case that Mr. Letourneau ended with, the jack-o'-lantern, and why it doesn't apply and doesn't give a rule of decision in this instance. And then I'll discuss the particular function issue. The jack-o'-lantern was a case about maritime contract jurisdiction and what-when a vessel becomes a vessel and or moves in and out of vesselness during a repair or reconstruction project. Both the District Court and the Supreme Court made clear in the first two or three sentences of their opinions that they were only addressing the issue of subject matter jurisdiction, i.e., whether there was a maritime contract at issue. That's necessary because if they don't have subject matter jurisdiction, they can't reach the merits of the case. Between the two decisions, they cited five authorities. Four of those authorities were cited for the jurisdictional question of when in that process of work being done on a vessel or construction, when does it become a vessel subject to being potentially the object of a maritime contract? And that would be the McMaster, the Dredge A, the Francis McDonald, and the Grace Mead. The fifth case that they cited, specifically by the Supreme Court, I think is by far the most interesting for how the case does or doesn't apply here, and that's the Piedmont decision, which was the Supreme Court just two years earlier. Piedmont, which this course has looked at, said that the Act of 1910 makes no change in the general principles of the present law of maritime liens. If you look at Piedmont, it addresses those general principles, and I'm going to read an excerpt from it. Referring to a ship in the abstract, they say, Since she is usually absent from the home port, removed from the residence of her owners, and without any large amount of money, it is essential that she should be self-reliant, that she should be able to obtain upon her own account needed repairs and necessaries. Because the ship's need was the source of the maritime lien, it could only arise if the repairs or supplies were necessary. It goes on to compare that to a lien that might arise under a material man statute, which was generally state law at the time. And they said, What we see is that already in 1920, it was well baked into maritime law that just because something can be termed repairs or supplies, it still must meet a necessary test. You still must look to the need of the vessel that you're supplying it to. That theme comes back in Benedict, which was cited in the motion panel in both directions. Benedict, at section 35, says, What is not furnished to fulfill a want of the ship cannot constitute repairs, supplies, or services for which the ship can be held in liable and rim. Again, necessity. Mr. Davis, before you leave that thought, I want to return you to Jack O'Lantern. It seems to me that the only issue you're really dealing with, I shouldn't put it that way, one issue you're dealing with right now is whether we're looking at the prior function of a particular vessel or the new function. In Jack O'Lantern, you had a barge to carry railroad trains, as I understand, and then it was made into an amusement barge. They are trying to figure out if this case should be in federal court. If it's new construction, it's not a maritime contract, it needs to be in state court. What the Supreme Court said after citing Piedmont is that we have not undertaken to announce rigid definitions of repairs on the one hand, which would be maritime, and new construction, which would not be. But we do not accept the suggestion that the two things can be accurately differentiated by consideration of the ultimate use to which the vessel is to be devoted, and then they talk about the Grace Mead case, which I think you referred to in your earlier discussion. And there, whether it's repairs or not, is really getting to whether you have changed the keel, and basically the underlying skeleton of the vessel, and which did not happen as to the CIT 103. So it seems to me, whether or not Jack O'Lantern said this is a maritime contract, but whether it created a maritime lien or not, it's a very strong indication that it is repairs, and it didn't turn on whether the railroad barge was still a railroad barge. Response? Yes, Judge. I'm willing to accept the proposition that the Jack O'Lantern found that they were repairs, but what it didn't find is that the repairs were necessary or needed by the vessel, and that's why it didn't reach the merits of the case. The standard that the Supreme Court applied in the Jack O'Lantern case... It's not why necessarily. It didn't need to reach the merits of the case. It was trying to determine whether there was jurisdiction in federal court or not. So I don't know if it's quite fair to say that's why it didn't decide whether there's a lien. That's a fair point. It did not reach the merits of the case, though. It did not declare that the repairs done were necessaries under the statute. And, again, that concept of necessaries had been in the general maritime law since the Aurora in 1816, where they said it must be shown that the advances were made for repairs and supplies necessary for effectuating the objects of the voyage, the burden being on the party claiming the lien. And the other point I would make in response is that the Supreme Court's decision applied a standard that is wholly incompatible with a merits analysis. The Supreme Court applied... It said, just after it cited the grace made, I believe, reasonable doubts should be resolved in favor of such jurisdiction. Well, that's the opposite. If you look at... When you're looking at the merits of a maritime lien case, there are constricted jurists against the idea of a maritime lien. So for all those reasons, again, our position, Jack O'Lantern has been cited since the beginning of this case as essentially the only authority that JBS is trying to stretch to cover this case. And as has been pointed out, it doesn't involve conjoinment of multiple vessels. It didn't consider the issue of necessaries and that want or need of the ship, which has been so central in this court's case law for over 100 years. Well, counsel, in what was done to this vessel, at least different than in the two principal sites that you have, this is not fuel being carried in a vessel to fuel another vessel. This is not a barge coming up next to a vessel with a crane that's lowering pieces of an oil and gas platform onto this additional vessel. What was done in CTR 103 that we're talking about that might have created a maritime lien is still done to that vessel itself, correct? It's done to the CIT 103 itself. It is. In order for it to serve its new function. It is, and that brings me exactly to the next point I was going to make on the particular function. And I think Mr. Letourneau actually framed it fairly well. If you looked at the Bechtolt dredge and the CIT 103, you have a 54-year-old dredge. It spent its whole life as a dredge, but it can't get Corps of Engineers jobs anymore because it's not efficient enough. It can't compete with modern dredges. And so they say, well, we need to put a booster pump on it. It, the Bechtolt dredge, needs a booster pump. That is a necessary for it in order to continue in commercial service. But it doesn't have enough deck space because it wasn't built to accommodate that equipment. So they say, well, let's take this flat deck barge, which has never been involved in dredging operations at all, and we'll just put all that equipment that the Bechtolt needs in order to function. We'll put it on the CIT 103. And to try to close the loop on it. Isn't that like putting a crane onto a barge? I don't think so. How is that different than, are you saying if they added a crane to this barge, that would not be necessary for it to serve its function in the same way? The function of a deck barge is to move equipment from point A to point B. You could make the argument that it's better able to move equipment from point A to point B if it can independently load and unload the equipment at the same time. So it's a little tiny step to say that a crane onto a deck barge designed to move equipment might be an improvement. It could be a necessary. It could be something. This equipment doesn't help it move from A to B, stuff from A to B at all. No. Actually, this equipment prevents it from doing that. It hinders it from hauling stuff back and forth. And what's interesting on that point is that in their emergency motion for a stay, it's in footnote 7, JBS takes a position that if it doesn't have a lien in this case, if the district court is affirmed, then CAIU is entitled to regain possession of the CIT 103, but that possession can only extend to the CIT 103's prior condition as an unpowered flat deck barge, not the booster pump and equipment JBS installed. In other words, what they're saying is if we don't have a lien, then we're just going to slide CAIU's barge back out. It no longer has those functions that they claim have changed its entire nature into a booster barge. They're going to remove those functions again because they're not really altering the function of the barge. If they can do that, then why can't you have it back just on its own? I've been asking that for months, Judge. I'd love to have an answer to that question. And they've asked for that. I'm sorry? They've asked for that as an alternative, right? To have it. To say that it would have to go back to you. We've been asking for it back for two years, and they've been removed. They said, well, you're going to get it back, but if you got it back, you would get it without that stuff we installed. If you can remove it, then you can remove it. It's not part of the barge. Yes, and Judge, as the case was pending after the decision on the motion to vacate, my client had quotes for $16,000 to separate the barges. It was not the ordeal that we were under, the belief it was. I had a couple of questions about what the standard of review is and what your authority for that is, and then another question about what relief do you seek from this court today? Judge, I like your standard of review under Chavez. This is a order vacating a maritime lien. The burdens in maritime lien cases under Rule E-4-F are strong and on the party claiming the lien. So I believe, yes, there are factual findings of the district court. I believe those are entitled to deference. So is it abuse of discretion, or is it some hybrid mix of factual for clear error? I believe it's abuse of discretion, but I don't have the case in my mind either. Okay. And then your second point. Well, Counselor, what if . . . Could I follow up on that before you ask your next question? Yes. If there's a legal error, and it seems to be the argument by the other side of the legal error, is that the court did not consider the new function of the barge. So if that's legal error, why would that be abuse of discretion? I wouldn't say that if it's a pure legal error, then no, that would not be. That would be a de novo. Well, let's say that was legal error. Just hypothesize that was legal error for the judge only to look at the old function of the barge and not the new function. So would we still review the final decision for abuse of discretion that has a legal error in it? I still think no, because there is no . . .  No, I'm saying . . . Maybe you mean yes. I still think you'd agree with me, or you'd find for me, because there is no authority to support the . . . It goes back to the subjective decision of the Charter. The decision needs to be made from the perspective of the vessel. Vessels are personified under admiralty law. This vessel has, under the law, individuality, and that is what determines its function. Again, I think equally said it best when it said the present apparent wants of the vessel. It's what can you look at the vessel, an objective observer, and say, this vessel needs this thing. It has paint coming off. It needs paint. It has steel repairs that are needed. It's not the future, potential, conceptual, possible uses of the vessel. It's the present apparent wants and needs of the vessel. And what is it that you seek this court to do? We believe the district courts should be affirmed, and the vessel should be ordered returned to us without further delay. Thank you. Thank you, Judge.  Good afternoon. Arthur Kratz on behalf of Appelli Manson Construction Company. I want to start by clarifying what issues I think are properly before the court today. And the only, and we addressed this in our brief, the only issue before the court today, or properly before the court today, is whether the district court erred in vacating the attachment of the CIT 103. Now, to be clear, inherent in the review of that order is the question we've been talking about all day today, which is whether John Bloodworth's shipyard has asserted, or has a necessary lien for the work that it did. But what Bloodworth has actually asked this court to do is a lot more than that. Bloodworth has asked this court to reverse the district court's denial of a motion for summary judgment, of Bloodworth's motion for summary judgment, and John Bloodworth's shipyards has asked this court to order that all three vessels be sold together as a single unit. And so— We don't have jurisdiction to reverse a denial of summary judgment, do we, counsel? Well, as Your Honor knows from my brief, I took the position that the court does not. I don't think the court does. I think it's relatively obvious that the order vacating the attachment of the CIT 103 is immediately appealable in admiralty. I don't think anybody's taken a different position on that. But I think this court has consistently been very clear that there is, with precious few exceptions, there is not appellate jurisdiction to review the denial of a motion for summary judgment. And I think that that's particularly acute here. I think what happened in this case is a great example for why this court has been so reticent to review the denial of motions for summary judgment. Because what the district judge did here on the summary judgment issue is after vacating the attachment of the CIT 103, he held that there were genuine disputes of material fact with respect to whether Bloodworth had a necessaries lien over my client's vessel, the Captain Frank Bechtol. What the district judge didn't reach, and he had no reason to, but what the district judge didn't reach was our additional affirmative defense that John Bloodworth Shipyard did not rely on the credit of the Frank Bechtol when it did its work, but it relied on the credit of T.W. LeQuay. And there are factual, we've argued this in our brief, there are numerous factual considerations that pervade that issue, which the district court didn't address because it didn't need to. So if I were to ask you the question of what the court should do, you would want us to say the district court did not err in vacating the attachment, but in any event, if we were to say the district court erred in vacating the attachment, we would remand for further proceedings in the district court rather than ordering a bunch of sales and distributions. Is that correct? That's precisely our position, Your Honor. Okay. So with all of that, I want to address the issue that most affects my client, which is the issue of the motion for summary judgment. And the legal issue here is very, very similar to, if not perhaps identical to, the one that's before the court on the motion to vacate the attachment, the question of whether John Bloodworth Shipyard has a necessaries lien in this case. And respectfully, I think Able Counsel for John Bloodworth Shipyards and my colleague who represents Cal U have both characterized the work done here as work to convert a deck barge into a new purpose. I respectfully disagree with that characterization of the work that John Bloodworth Shipyard did. I think a question that Your Honor asked earlier gets to the heart of our position on this, which is the work that John Bloodworth Shipyard did in this case was it took three separately owned vessels and combined them into a single unit. And we've consistently described the work that way throughout the proceedings in the district court and in our briefing to this court. And I think the reason why John Bloodworth Shipyards has shied away from that characterization, even though I think it's completely accurate, is because as John Bloodworth has conceded, there's no case anywhere, ever, that has held that a necessaries lien exists for the combination of three vessels as a single unit. In Able Counsel, there's no case, period, that said anything about that, correct? So it's not just never said there was, it's never said there wasn't. This is sui generis for us. I would agree with Your Honor on that. And I guess my follow-up response to that is the point that the district judge made below when he said the absence of precedent signifies the weakness of plaintiff's position since Admiralty enjoys an unusually rich legal tradition and more nearly that any other contemporary area of federal law relies on venerable precedents where they exist. And the district judge was quoting this court when he said that. And so... Well, why wouldn't the work on each individual vessel, at least, create a maritime lien as to that vessel and the work that was done on that one? So I missed the first part of Your Honor's question. I think if I understand it correctly, you were asking... Well, let me restate. Okay. Let me restate. Why wouldn't the work done on each individual barge vessel create a maritime lien as to that work as to that vessel? So that requires a specific analysis with respect to whether the work done on each of the vessels was necessary for the particular function of that vessel. And that's what this court has decided in several cases. If I had to pick a favorite, it would be the Norr Goliath case. I think Your Honor referred to it as the Central Boat case. I think that's your opinion, Judge Higginbotham. Although, Judge Elrod, I recognize you were on that panel as well. And this is the point also that Judge Willett made in his dissent from the motions panel opinion in this case. And I will do my very best to make the argument at least half as eloquently as Judge Willett did. But what Judge Willett outlined, I think, is a correct summary of this court's precedents, which is that in order for a necessaries lien to exist, there's effectively two questions that have to be answered. The first question is whether the services that were provided to the vessel, the services upon which the lien is based, are of the type that could give rise to a necessaries lien. And I think to sort of touch on what we've heard here today, the jack-o'-lantern might give us a little bit of help in answering that question. But the second question, and I think this is the critical question in this case, is whether those services rise to the level of necessaries, whether they're necessary for the particular function of the vessel in the performance of its mission. And, Judge Southwick, I think this goes directly to the question you asked a minute ago, which is if you look at the services provided to each vessel, are they necessaries? And my answer for you is that's precisely the question that has to be analyzed, is whether they're necessary for that specific vessel. And I think in this case, respectfully, that's a very, very fact-bound issue, which is why we've taken the position on appeal that the district court's ruling denying Bloodworth's motion for summary judgment on this was correct, because there are innumerable factual issues that ought to be resolved at a full trial on the merits, on a fully developed record, where the district court could parse those issues out. And so, and this is sort of, and on a related point, I want to come back to the Central Boat case, or as I call it, the Norgoliath case. Your Honor's heard some argument earlier about the question of, from whose perspective do we determine what the particular function of the vessel is? And, Judge Elrod, you asked the question, does the subjective intent of the operator of the charter of the vessel matter? And I want to answer that question directly. No, it does not. And the best case that stands for that proposition is the Central Boat, Reynolds v. Norgoliath case. And in that case, this court specifically held that Epic, who was the general contractor on the project, or as we sometimes say in the maritime law, the charterer of the vessels, from Epic's perspective, in the Norgoliath case, the work of the tugs to move the barge on which the drilling rig was placed was essential, indeed, indispensable for the project. But that's not the analysis, is what this court held in Norgoliath. The analysis is whether the services provided by the tugs were necessary in order for the Norgoliath, which is a heavy lift vessel, to perform its specific mission, which is to lift heavy objects. And the answer to that question was no. And so I think the district court in this case was 100% correct when it analyzed the issue from the perspective of the vessel itself. And necessarily, I think, and perhaps to use that word more ironically than I intended to, but necessarily that analysis has to start with the function of the vessel before the work is done, right? And because if the vessel comes into the shipyard as, and I'll just use the example of the CIT 103, an unpowered deck barge, and we add, or we take the example of the jack-o'-lantern, we add accommodation areas, we turn it basically into a, to use a more colloquial term, a party barge, then all of a sudden, for example, the supply of liquor, that would be a necessary probably to a party barge, but obviously it's not with respect to an unpowered deck barge. And that's why the only way that this rule is workable, and the reason it has been workable in district courts for over a century, is because we analyze this question from the perspective of the vessel itself, not based on the subjective intent of the parties who are using it. I see I'm out of time. Counsel, let me ask you. Go ahead, Jeeve. I'll follow up. I just was wondering, I'm not foreshadowing, but if we were to determine that the district court did not err in vacating the attachments, would we still be remanding? We remand either way. You would, Your Honor, because the situation procedurally that the district court, for lack of a better term, left the case in was that the arrest of the CIT 103 had been vacated. My client's vessel, the Dredge Frank Bechtel, remained under arrest. The idler barge remained under arrest. That still has to be, we couldn't deal with that. No, the district court specifically held that genuine disputes of material fact precluded summary judgment with respect to the necessaries lien on my client's vessel. Either way, but it's just whether or not the district court erred in vacating the attachment is the way you see the problem. That is the way I see it, Your Honor. Judge Southwick has a question or two or as many as he has. You picked up on it just a bit in your answer to the Chief, but a chapter or two ago in your argument, you were talking about what the fact questions are, and I think you may have repeated it just now. You are saying there is, in fact, are fact questions in determining whether there are maritime liens as a result of what the shipyard did on each of these vessels? So I'm primarily focused, of course, on my client's vessel. Okay, well, the limit to you is you don't need to go beyond those. So as to your vessel, your client's vessel. Yes. You say there are fact questions. There could well be a maritime lien on that vessel, but we're not there yet. So our position is that there is not a maritime lien on the Captain Frank Bechtold, but we recognize and acknowledge the district court's, and from my perspective, correct holding, that there are genuine disputes of material fact about that. Our position is that all of the work that was done on the Captain Frank Bechtold was, you know, In fairness to John Bloodworth Shipyard, they've taken a different position. They've alleged that at least some of those services were necessary to the Captain Frank Bechtold just standing alone, and there's a genuine dispute of material fact on that, and that's going to have to be resolved at trial before the district court. Thank you. Thank you. Thank you. Your Honor, if I may follow up on that question about the standard of review. We did address the standard of review in our brief. It was at page 18. It's the Aquistoli case, and I'll read from it. We generally review the district court's decision vacating a maritime attachment order for abuse of discretion. However, a district court necessarily abuses its discretion when its decision rests on an error of law or a clearly erroneous finding of fact, because we are here reviewing a legal predicate for the exercise of discretion. Our review is de novo. And so our view is that this is a de novo review, and the reason I say that is because essentially the case turns in the district court as to the function of the vessel. And the function of the vessel, while I talked about the owner in control making that decision, it's an objective standard in the sense that you look at the function of the vessel. If shipyards had to look at the original condition of a vessel before they undertook work, they would never do the work because they would never have a maritime lien. Every ship over the course of its history gains weight. And why do they gain weight? They gain weight because they add equipment. They add capabilities. And if you add capabilities over time, you change functionality. And that's what happened in this case. Functionality changed with respect to the booster bars. And if you ask me what we would like to accomplish from this court's decision, it would be to resolve everything in one package. Our client has spent money hand over fist in terms of custodial legis expenses over the course of the last two and a half years, over $400,000 as of July of 2024, $20,000 a month. If there, in fact, is a maritime lien against all three vessels, then these three vessels should be sold. We believe they should be sold in a conjoined fashion because that will maximize the value of the return for all the parties. We believe that there is also interlocutory jurisdiction to handle all of these issues, contrary to our respective opposing counsel. And the reason we say that is if you take a look at the Hines decision in the Fifth Circuit, while it construed interlocutory jurisdiction under the Federal Arbitration Act, it discussed analogous interlocutory jurisdiction cases, in particular the Melder case from 2005 from the Fifth Circuit, which construed the scope of interlocutory jurisdiction under 28 U.S.C. 1292b. And quoting from the Hines case is, an issue is considered fairly included in the appealable order when it was raised in the district court and the parties presented it in their appellate briefs. And in this case, the credit of the vessel issue was raised in the district court, addressed in the appellate briefs. The Manson's prohibition of liens clause argument was raised in the district court, addressed in appellate briefs. Caillou's latches argument was raised in the district court, argued in the appellate briefs. Our damages arguments were raised in the district court and addressed in our appellate briefs. What about the affirmative defense? The affirmative defense in terms of the credit of the vessel, Your Honor, I think actually this can be disposed of by a citation to the Equalese case. And if I might have that case. Equalese has a quote that says, and this was under the previous iteration of the Federal Maritime Liens Act under Section 71, a presumption arises that one furnishing supplies to a vessel acquires a maritime lien and the party attacking this presumption has the burden of establishing that the personal credit of the owner or charter was solely relied upon. That is to defeat the presumption. That evidence does not exist in the summary judgment record in this case, and that is error because, and that's an error of law, because the presumption was not met. And because that presumption was not met, then we don't have that burden. The Simla, the current iteration of the Federal Maritime Liens Act, basically says that we neither have to allege nor prove credit of the vessel. It is on the burden of the party that's challenging it. And they did not meet that burden. Counsel, it seems to me in the district court's view, perhaps, or maybe it's just in the briefing, I think it was your client, but deposition testimony saying I was relying on LaCroix. Now, it may not mean much. It seems hard to me to believe the shipyard wouldn't also want the lien, but this does seem to be some contrary evidence here. Well, Your Honor. Whose deposition was that? The only depositions in the case were two depositions of Gaspard Deanna, the president of John Bloor Shipyard. And in both of those depositions, he testified that over the course of the last 25 years, he's known that he could always lien the vessel. He had that prerogative. He actually did it again in this case. We liened another vessel and we sold it at judicial auction. So he knew, and I would submit to you that had the questions been asked, did you solely rely upon the credit of the vessel? Did you exclusively rely upon it? Did you only rely upon it? Those questions were never asked. They should have been, but they weren't by our esteemed opponents. But our take on it is that's not our burden. Our client testified that he knew that he could lien the vessels, and he did. And, in fact, sold one of them before and has done so previously, and that is also in his testimony. Thank you. We have your argument. We appreciate all the arguments in the case today. Thank you for all being so prepared. And this is very interesting, so thank you for that. Thank you, Your Honor. The court will stand in recess until tomorrow morning.